UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| IN RE SIX FLAGS ENTERTAINMENT CORPORATION DERIVATIVE LITIGATION | § § § | Civil Action No. 4:20-cv-00262-P (Consolidated with Nos. 4:20-cv-00311-P and 4:20-cv-00312-P) |
| | § | |
| | § | (Consolidated Derivative Action) |
| This Document Relates To: | § § | |
| ALL ACTIONS. | § § | Judge Mark T. Pittman |
| | § | |

**VERIFIED CONSOLIDATED STOCKHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, WASTE OF CORPORATE ASSETS, UNJUST ENRICHMENT, AND VIOLATIONS OF FEDERAL SECURITIES LAWS**

Plaintiffs Mark Schwartz; Deborah Martin, William Herpel, William Blumerich, Geoff Donaldson, Karen Farr, Karry Hepting, William Oldford, Jorja Baldwin, and James Spadafore, in their capacities as Trustees of the St. Clair County Employees' Retirement System; and Mehmet Ali Albayrak ("Plaintiffs"), by their attorneys, submit this Verified Consolidated Stockholder Derivative Complaint for Breach of Fiduciary Duty, Waste of Corporate Assets, Unjust Enrichment, and Violations of Federal Securities Laws, derivatively for the benefit of Nominal Defendant Six Flags Entertainment Corporation ("Six Flags" or the "Company").  Plaintiffs base their allegations on personal knowledge and, as to all other matters outside their personal knowledge, upon information and belief based on the investigation of counsel, which includes without limitation: (i) review and analysis of public filings with the United States Securities and Exchange Commission ("SEC"); (ii) review and analysis of filings in federal court, including pleadings in the related securities fraud class actions, *Electrical Workers Pension Fund, Local 103, I.B.E.W. v. Six Flags Ent. Corp.*, No. 3:20-cv-00346-K (N.D. Tex.) (filed Feb. 12, 2020) and *Klein v. Six Flags Ent. Corp.*, No. 3:20-cv-00460-K (N.D. Tex.) (filed Feb. 24, 2020) (the "Securities Class Actions")[1]; and (iii) review and analysis of press releases, news reports, analyst reports, industry reports, investor conference call transcripts, and other information available in the public domain.

## INTRODUCTION

1.      This is a stockholder derivative action brought on behalf of and for the benefit of Six Flags, against certain of its current and former officers and directors, seeking to remedy their breaches of fiduciary duty, waste of corporate assets, unjust enrichment, and violations of the

---

[1]      On March 2, 2020, the Securities Class Actions were consolidated and transferred from the Northern District of Texas, Dallas Division to the Northern District of Texas, Fort Worth Division under Case No. 4:20-cv-00201-P.

federal securities laws.  Defendants' actions have caused substantial financial and reputational harm to Six Flags.

2.      Six Flags is the world's largest regional theme park company with $1.5 billion in revenue and 26 parks across North America.  Of the 26 regional theme parks and waterparks, 23 are located in the United States, two are located in Mexico, and one is located in Montreal, Canada.  The Company's parks serve an aggregate population of approximately 140 million people and 250 million people within a radius of 50 miles and 100 miles, respectively, with some of the highest per capita gross domestic product in the United States.

3.      In addition to generating revenue by operating its North American parks, Six Flags earns revenue pursuant to international licensing agreements to assist third parties in the development and management of Six Flags-branded parks overseas.  As compensation for exclusivity, brand licensing rights, and design, development, and management services, the Company receives fees during the planning, design, and development phase of each park and then receives royalties and management fees once the park is operational.

4.      On June 23, 2014, Six Flags announced an agreement to build multiple Six Flags-branded theme parks in China.  Six Flags partnered exclusively with Riverside Investment Group Co. Ltd. ("Riverside"), "a leading real estate developer in China," which among other things would provide the capital investment for future developments in China.

5.      Six Flags emphasized expansion of its international licensing agreements as one of its key strategies to achieve revenue growth, and Six Flags' agreements with Riverside to develop parks in China were of particular importance to investors because they represented the largest potential driver of growth in this strategic initiative.  Indeed, the Company's international expansion was viewed by analysts and investors as low risk/high reward because Six Flags was not required to invest its own capital yet would still achieve exceptionally high margins.

6.      On April 24, 2018, Six Flags issued a press release touting its partnership with Riverside and the planned addition of three new branded theme parks in Nanjing, the capital of Jiangsu province and the second largest city in the East China region.

7.      The next day on an investor conference call, Six Flags' Chief Executive Officer (CEO) assured investors that the expansion into China remained on track, that "all our parks are progressing nicely towards their anticipated opening dates," and that "[w]e're very confident."

8.      Just weeks later, on May 29, 2018, Six Flags announced plans with Riverside to develop a fourth park in Nanjing, thereby increasing the partnership's scope of development in China to 11 parks across three locations.  It boasted: "There is a huge, untapped audience for the type of innovative, thrilling entertainment Six Flags is known for, and we look forward to welcoming guests from throughout China to experience all of our parks with family and friends."

9.      As a result of these positive statements, Six Flags' common stock price rose from $59.16 per share on April 24, 2018 to hit $71.81 per share on September 7, 2018.

10.     Thereafter, Six Flags' management continued to hype the Company's expansion into China, touting its strategic partnership with Riverside as an "incredible partnership" that "should supercharge revenue growth."  Management also assured investors that Riverside would "work[] through" the macroeconomic issues that it faced in China and represented that delays in the development of its Six Flags-branded parks in China were "short term" and the resulting weakened revenue patterns were "not material in the context of the long term opportunity."

11.     The Company's positive spin, however, was soon shown to lack a reasonable factual basis.  Six Flags' statements were false and misleading when made because Defendants (defined below) knew or recklessly disregarded that: (i) Riverside faced far more financial distress than disclosed to investors; (ii) as a result, there was a significant risk and a high likelihood that Riverside would default on its payment obligations to the Company; (iii) the Company's

international strategy, which relied predominantly on Riverside to develop Six Flags-branded parks in China to drive revenue growth, was significantly less promising than represented to investors; and (iv) as a result of the foregoing, Six Flags' statements about its business, operations, and prospects lacked a reasonable basis when made.

12.     The truth began to emerge on February 14, 2019, when Six Flags surprised investors by announcing a negative revenue adjustment of $15 million in Q4 2018 due to delays in the expected opening dates of some of the parks in China, which the Company blamed on macroeconomic issues in China.  As a result, Six Flags reported a 38% decline in the Company's sponsorship, international agreements, and accommodations revenue compared to Q4 2017. Six Flags also told investors that it expected weaker than anticipated quarterly revenue from its agreements with Riverside in 2019 and 2020.

13.     In response, the Company's stock price dropped over 14%, from $63.87 per share on February 13, 2019 to $54.87 per share the next day, erasing more than $756 million in market capitalization.

14.     On October 23, 2019, Six Flags again postponed its park openings in China, stating that "there's a very high likelihood going forward that we will see changes in the timing of park openings" and "it's unrealistic to think it's going to be exactly as we've outlined."  As a result, the Company reported another 26% decline in sponsorship, international agreements, and accommodations revenue for Q3 2019 compared to Q3 2018.

15.     The Company's stock price responded by dropping 12.4%, from $51.23 per share on October 22, 2019 to close at $44.88 per share on October 23, 2019, destroying another $536 million in market capitalization.

16.     Then, on January 10, 2020, Six Flags admitted that the future of its projects in China was in jeopardy.  It announced that the development of the Six Flags-branded parks in China

continued to encounter challenges and had not progressed as expected.  The Company also reported that Riverside continued to face significant challenges due to the macroeconomic environment and declining real estate market in China, which caused Riverside to default on its payment obligations to Six Flags.  Making matters worse, it disclosed that in Q4 2019 it would not realize any revenue from its agreements with Riverside and, in fact, it expected to take a negative $1 million revenue adjustment.  The Company also announced one-time charges totaling approximately $10 million related to Riverside's default.

17.     As a result, the Company's stock price fell 17.8% from $43.76 per share on January 9, 2020 to close at $35.96 per share the following day, eliminating another $659 million in market capitalization.

18.     Finally, on February 20, 2020, the Company issued a press release announcing that it had a *net loss* for Q4 2019 of $(11) million, down $91 million from $79 million in net income for Q4 2018.  Six Flags stated this was due in part to "charges of approximately $10 million related to the company's China development agreements and certain unrelated litigation matters."  The Company further announced that it had formally terminated its agreements with Riverside.

19.     Six Flags' announcements once again sent its stock price plummeting from $38.02 per share on February 19, 2020, to close at $31.89 per share on February 20, 2020.  This 16% drop wiped out $518 million more in market capitalization.

20.     As a direct result of Defendants' unlawful course of conduct, the Company misled the investing public about its strategic partnership with Riverside, and the progress and prospects of its expansion into China.  Consequently, Six Flags is now the subject of the Securities Class Actions.  The Securities Class Actions assert claims under §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") against the Company and two of its top executives in

connection with these improper public statements which artificially inflated the price of Six Flags' common stock.

21.     The Defendants named in this Complaint face liability to the Company for their misconduct for, among other things: (a) affirmatively making or failing to correct the false and misleading statements provided to the investing public; (b) causing the Company to waste corporate assets by repurchasing its own stock at prices artificially inflated by Defendants' misconduct; (c) trading personally-held Six Flags' shares based upon material nonpublic information; (d) failing to implement, maintain, and monitor appropriate internal controls over the Company's public release of information to analysts and investors; and/or (e) failing to implement, maintain, and monitor appropriate internal controls over transactions in Company stock by Six Flags insiders and the Company itself.

22.     Due to the Six Flags' Board of Directors' (the "Board") direct involvement in the wrongdoing, the substantial likelihood of liability its members face, and its members' lack of independence, any demand upon the Board to rectify this wrongdoing would be a wasteful and useless act.  Accordingly, Plaintiffs bring this action to remedy the harm to Six Flags caused by the Defendants' faithless actions.

## JURISDICTION AND VENUE

23.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331 over (a) the contribution claims asserted herein under § 21D of the Exchange Act, 15 U.S.C. § 78u-4(f) and (b) over the claims asserted herein for breach fiduciary duty premised upon duties imposed and defined by the federal securities laws, rules, regulations, and federal substantive corporate law.  This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) over all other claims that are so related to claims in this action within the Court's original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

24.     This Court also has jurisdiction over the claims asserted herein under 28 U.S.C. § 1332 because there is complete diversity among the parties and the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs.

25.     This Court has personal jurisdiction over each Defendant because each Defendant is either a corporation conducting business and maintaining operations in this District or is an individual who is either present in this District for jurisdictional purposes or has, directly and indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, interstate telephone communications, and the facilities of the national securities exchanges and markets, such that each Defendant has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

26.     Venue is proper in this jurisdiction pursuant to 28 U.S.C. § 1391(b) because (i) Six Flags maintains its principal place of business in this District; (ii) one or more of the Defendants resides or maintains offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein occurred in this District; and (iv) Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## PARTIES

**Plaintiffs**

27.     Plaintiff Mark Schwartz is, and has continuously been, a shareholder of Six Flags since March 13, 2014.  Schwartz is a citizen of the State of Colorado.

28.     Plaintiffs Deborah Martin, William Herpel, William Blumerich, Geoff Donaldson, Karen Farr, Karry Hepting, William Oldford, Jorja Baldwin, and James Spadafore, in their capacities as Trustees of the St. Clair County Employees' Retirement System. St. Clair County

Employees' Retirement System is, and has continuously been, a shareholder of Six Flags since October 2017.  Plaintiffs are each citizens of the State of Michigan.

29.     Plaintiff Mehmet Ali Albayrak is, and has continuously been, a shareholder of Six Flags since May 2018.  Albayrak is a citizen of the Republic of Turkey.

**Nominal Defendant**

30.     Nominal Defendant Six Flags was founded in 1961 and claims to be the largest regional theme park operator in the world, and the largest operator of waterparks in North America. Of its 26 regional theme parks and waterparks, 23 are located in the United States, two are located in Mexico, and one is located in Montreal, Canada.  The Company operates the following parks in Texas: (i) Six Flags Fiesta Texas (San Antonio); (ii) Six Flags Hurricane Harbor (Arlington); (iii) Six Flags Over Texas (Arlington); and (iv) Six Flags Hurricane Harbor Splashtown (Spring). Additionally, Six Flags' principal executive offices are located at 924 Avenue J East, Grand Prairie, Texas.

31.     The Company's common stock trades on the New York Stock Exchange (NYSE) under the ticker symbol "SIX."  As of October 18, 2019, the Company had 84,524,441 shares of common stock outstanding.

**Individual Defendants**

32.     Defendant James Reid-Anderson ("Reid-Anderson") served as Chairman, President, and CEO of the Company between July 2017 and November 18, 2019.  From February 2016 to July 2017 he served as Executive Chairman of the Company, and from August 2010 to February 2016, he served as Chairman, President, and CEO.  Reid-Anderson is named as a defendant in the related Securities Class Actions which allege he violated §§ 10(b) and 20(a) of the Exchange Act.  Reid-Anderson breached his fiduciary duties to the Company and its stockholders as described below.  Defendant Reid-Anderson also knowingly, recklessly, or with

gross negligence made (or allowed to be made) improper statements in Six Flags' press releases, public filings, and other public statements relating to the Company's international business, operations, and growth prospects.  As of March 12, 2019, Reid-Anderson beneficially owned 3,987,545 shares of SIX common stock, which was worth more than $196 million.  Between June 7, 2018 and June 20, 2018, while the price of Six Flags' stock was artificially inflated and Reid-Anderson was in possession of material, adverse nonpublic information, he sold 200,000 shares of personally-held Six Flags' common stock for proceeds exceeding $14.2 million.  In 2018, the Company paid Reid-Anderson total compensation of $7,360,672 (salary of $1,800,000, stock awards of $1,519,957, option awards of $2,473,569, non-equity incentive plan compensation of $1,447,209, and $119,937 in other compensation).  Upon information and belief, Reid-Anderson is a citizen of the State of Illinois.

33.     Defendant W. Marshall Barber ("Barber") served as Six Flags' Chief Financial Officer (CFO) between February 2016 and February 24, 2020.  Barber is named as a defendant in the related Securities Class Actions which allege he violated §§ 10(b) and 20(a) of the Exchange Act.  Barber breached his fiduciary duties to the Company and its stockholders as described below.  Defendant Barber also knowingly, recklessly, or with gross negligence made (or allowed to be made) improper statements in Six Flags' press releases, public filings, and other public statements relating to the Company's international business, operations, and growth prospects.  As of March 12, 2019, Barber beneficially owned 168,758 shares of SIX common stock, which was worth more than $8.3 million.  In 2018, the Company paid Barber total compensation of $1,234,418 (salary of $538,000, stock awards of $141,972, option awards of $198,500, non-equity incentive plan compensation of $324,416, and $31,530 in other compensation).  Upon information and belief, Barber is a citizen of the State of Texas.

34.     Defendant Richard W. Roedel ("Roedel") has served as a Board member since December 2010.  He has also been a member of the Board's Audit Committee since 2010.  Roedel breached his fiduciary duties to the Company and its stockholders as described below.  Roedel also knowingly, recklessly, or with gross negligence made (or allowed to be made) improper statements in Six Flags' press releases, public filings, and other public statements relating to the Company's international business, operations, and growth prospects.  As of March 12, 2019, Roedel beneficially owned 61,104 shares of SIX common stock, which was worth more than $3 million.  In 2018, the Company paid Roedel $249,925, $159,970 of which was paid in SIX stock awards.  Upon information and belief, Roedel is a citizen of the State of South Carolina.

35.     Defendant Kurt M. Cellar ("Cellar") has served as a Board member since May 2010.  He has also been a member of the Board's Audit Committee since 2010.  Cellar breached his fiduciary duties to the Company and its stockholders as described below.  Cellar knowingly, recklessly, or with gross negligence made (or allowed to be made) improper statements in Six Flags' press releases, public filings, and other public statements relating to the Company's international business, operations, and growth prospects.  As of March 12, 2019, Cellar beneficially owned 80,116 shares of SIX common stock, which was worth more than $3.9 million.  In 2018, the Company paid Cellar $262,470, $159,970 of which was paid in SIX stock awards.  Upon information and belief, Cellar is a citizen of the State of Connecticut.

36.     Defendant Nancy A. Krejsa ("Krejsa") has served as a Board member since March 2017.  Krejsa breached her fiduciary duties to the Company and its stockholders as described below.  Krejsa also knowingly, recklessly, or with gross negligence made (or allowed to be made) improper statements in Six Flags' press releases, public filings, and other public statements relating to the Company's international business, operations, and growth prospects.  As of March 12, 2019, Krejsa beneficially owned 187,656 shares of SIX common stock, which was

worth more than $9.2 million.  In 2018, the Company paid Krejsa $229,970, $159,970 of which was paid in SIX stock awards.  Upon information and belief, Krejsa is a citizen of the State of Illinois.

37.     Defendant Jon L. Luther ("Luther") has served as a Board member since May 2010. Luther breached his fiduciary duties to the Company and its stockholders as described below. Luther also knowingly, recklessly, or with gross negligence made (or allowed to be made) improper statements in Six Flags' press releases, public filings, and other public statements relating to the Company's international business, operations, and growth prospects.  As of March 12, 2019, Luther beneficially owned 57,576 shares of SIX common stock, which was worth more than $2.8 million.  In 2018, the Company paid Luther $271,591, $159,970 of which was paid in SIX stock awards.  Upon information and belief, Luther is a citizen of the State of Florida.

38.     Defendant Stephen D. Owens ("Owens") has served as a Board member since May 2010.  He has also been a member of the Board's Audit Committee since 2016.  Owens breached his fiduciary duties to the Company and its stockholders as described below.  Owens knowingly, recklessly, or with gross negligence made (or allowed to be made) improper statements in Six Flags' press releases, public filings, and other public statements relating to the Company's international business, operations, and growth prospects.  As of March 12, 2019, Owens beneficially owned 26,679 shares of SIX common stock, which was worth more than $1.3 million. In 2018, the Company paid Owens $262,470, $159,970 of which was paid in SIX stock awards. Upon information and belief, Owens is a citizen of the State of New York.

39.     Defendant Usman Nabi ("Nabi") served as a Board member between May 2010 and January 30, 2020.  Nabi breached his fiduciary duties to the Company and its stockholders as described below.  Nabi also knowingly, recklessly, or with gross negligence made (or allowed to be made) improper statements in Six Flags' press releases, public filings, and other public

statements relating to the Company's international business, operations, and growth prospects.  As of March 12, 2019, Nabi beneficially owned 7,520 shares of SIX common stock, which was worth more than $370,000.  In 2018, the Company paid Nabi $223,303, $159,970 of which was paid in SIX stock awards.  Upon information and belief, Nabi is a citizen of the State of California.

40.     Defendants Reid-Anderson and Barber are collectively the "Officer Defendants." Defendants Reid-Anderson, Roedel, Cellar, Krejsa, Luther, Owens, and Nabi are collectively the "Director Defendants."   Roedel, Cellar, and Owens are the "Audit Committee Defendants." Together, the Officer Defendants and the Director Defendants are sometimes referred to as "Defendants."

## DEFENDANTS' MISCONDUCT

### Company Background

41.     Six Flags is the world's largest regional theme park operator, with more than two dozen parks across North America.

42.     In addition to generating revenue through the operation of its parks in North America, Six Flags earns revenue pursuant to international licensing agreements to assist third parties in the development and management of Six Flags-branded parks outside of North America.  Pursuant to these agreements, the Company receives fees during the planning, design, and development phase of each park, and then receives royalties and management fees once the parks open.

43.     The Company's SEC Form 10-K for FY 2018 described its "International Agreements" as follows:

> We have signed agreements to assist third parties in the development and management of Six Flags-branded parks outside of North America.   As compensation for exclusivity, brand licensing rights, and design, development and management services, we receive fees during the design and development period as well as ongoing remuneration after the parks open to the public.  The agreements

do not require us to make any capital investments in the parks.  We currently have agreements to develop Six Flags-branded parks in China, Saudi Arabia, and Dubai.

44.     Consequently, the Company's international expansion was viewed by analysts and investors as low risk/high reward or "capital light" since Six Flags is not required to invest its own capital but, nonetheless, it still achieves exceptionally high margins.

45.     A May 15, 2019 Wells Fargo analyst report described Six Flags' international expansion strategy as follows:

> While currently only ~3% of revenue, the 80% Adj EBITDA margin and expected significant ramp over the next several years, make this asset light license/fee stream a critical component to SIX's growth and return of capital story.

46.     As a result of this low outlay, high margin strategy, Six Flags' common stock consistently traded at a sizeable premium to the rest of its peer group.

**Six Flags' International Expansion**

47.     On June 23, 2014, Six Flags announced the signing of an agreement with a Chinese real estate developer, Riverside, to build multiple Six Flags-branded theme parks in China.  The Company's press release quoted Six Flags' CEO as saying: "Our international expansion strategy is focused on finding the right partners in the right markets, and Riverside Investment Group will be the perfect strategic partner for us in China."

48.     The announcement further described Riverside as follows:

> Riverside Investment Group Co. Ltd. was registered in Canada in 1997.  With China's fast-developing cultural and tourism industries and urbanization process, Riverside Group has become a leading real estate developer, focusing on overall health care, tourism, culture, entertainment industries and high-end residential buildings.  It is also an investor, constructor and operator of middle and high-end communities, participating in the whole industrial chain from planning and design to construction, business attraction and operation.

49.     Under the agreement, Riverside would provide the capital investment for future developments in China and would pay Six Flags consulting fees during the development period of each park and then licensing and management fees once the parks opened.  While the Company

did not disclose the detailed terms of the arrangements for any of their international licensing agreements, Six Flags represented that each international park would contribute $5 million to $10 million annually to EBITDA preopening, and then at least $10 million to $20 million annually post-opening.

50.    The Company emphasized the expansion of its international licensing agreements as one of its key strategies to achieve revenue growth, and Six Flags' agreements with Riverside to develop parks in China represented the largest potential driver of growth in this strategic initiative.  For example, during the Company's Q4 2018 earnings call, Six Flags' then-CEO Reid-Anderson described the opportunity to expand the Company's international agreements revenue, stating, "China is the biggest of all, and the vision of both Six Flags and Riverside is to build multiple parks."

51.    Six Flags' Chinese theme parks were targeted for development near population centers in Central and Eastern China, with Chongqing (Chongqing parks) and Shanghai (Haiyan and Nanjing parks) being the focus cities.  The projects in these cities included plans for full-scale theme parks, waterparks, and smaller-scale children's parks.

**Defendants Made or Allowed Improper Public
Statements Regarding Six Flags' Expansion into China**

52.    Beginning in April 2018 at the latest, Defendants made or allowed to be made, and failed to correct, untrue statements of a material fact and omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.  Such statements and omissions were made in violation of § 10(b) of the Exchange Act and Rule 10b-5.

53.    On April 25, 2018, Six Flags held its Q1 2018 earnings call.  The call was attended by Reid-Anderson and Barber.  During the call, in describing the deals with Riverside to build parks in China, Reid-Anderson stated:

- 14 -

[REID-ANDERSON]   This month, we announced our newest international licensing locations in Nanjing, China and Riyadh, Saudi Arabia. . . . We now have 12 parks in 5 locations under development since announcing the strategy just 4 years ago.  The 3 new parks in China are expected to begin opening in 2021, and the theme park in Saudi Arabia is expected to open in 2022.

*       *       *

[ANALYST]   Okay, great.  And also very encouraged by the parks that you announced in China.  Where are we as far as the Chinese expansion? Maybe what inning are we in?  Or how many more opportunities do you think we're going to see there or that can be weighted towards just other regions of the world? Any type of detail you could give us there, that would be helpful.

[REID-ANDERSON]   Well, I would tell you that and I don't know if you remember, Ian, when we first started talking about China, when we announced the initial Riverside deals, I said that the discussions with our partner, and we had had focused in on really being in the range of at least 10 parks within 10 years, and we're at 10 announced already.  So when you look at the market itself, it's so encouraging because we've announced these 3 new parks.  We don't have a specific number that we're setting.  But when you look at the demographics of China, the fact that the population is 4x the U.S., there are half the number of parks.  There are massive cities which have very little in the way of entertainment options and certainly not the quality of the sort of parks we have.  So a regional strategy in China makes a lot of sense.  ***And we will not be stopping at 10 parks, I can assure you that, and our partner is very excited about being able to expand further with us.***

*       *       *

[REID-ANDERSON]   . . . [W]e can run multiple projects annually.  We're in this position where we've developed all these incremental parks, 12 parks coming, we've got a great pipeline of deals that provide a hedge against any one single deal or any one single market.  China is the biggest of all, and the vision of both Six Flags and Riverside is to build multiple parks.  I mentioned it earlier, 4x the population, half the theme parks.  I believe that China will overtake the U.S. in total theme parks sometime after 2020.

*       *       *

[ANALYST] Okay, great.  And then I guess just following up on China specifically there, we have seen some, I guess, news flow from the National Development and Reform Commission that they would maybe put more scrutiny on these kind of large-scale theme park developments.  Any kind of color or commentary there, if that impacts you guys or how that can impact the industry overall?

[REID-ANDERSON]   We obviously keep track of what's going on in all of the countries in which we operate.  And I think the way to think about it is really as follows.  ***You've heard me talk about our partners, an incredible partnership with***

- 15 -

***Riverside. They are building 10 parks. They're on their way to building 10 parks***. We've talked about building multiple parks. There is no ban on theme park development in China. There are a series of guidelines that were issued regarding theme park developments. They're mostly focused on the real estate aspects of theme park development but also touch on enhanced theme park standards. They're not laws, but they do portend greater regulation of theme park development, in line with what we have in North America or Europe or around the world generally. ***Our partner has not only successfully navigated the regulatory environment in China before but will continue to do so going forward***. And I think it's really good to have regulations that make sense. ***So right now, barring some other decision that's made, all our parks are progressing nicely towards their anticipated opening dates. And hence, we've announced 3 more parks. We're very confident***.

(Emphasis added).

54.    The Q1 2018 earnings call presentation was accompanied by a series of slides including the following two slides touting "International licensing" as an area for substantial growth:




55.    Six Flags also included the following slide which described the Company's international licensing strategy:



56.    It further claimed to be delivering shareholder value by leveraging its brand outside of North America:



57.    On July 25, 2018, Six Flags held its Q2 2018 earnings call.  The call was attended by Reid-Anderson and Barber.  On that call, Reid-Anderson and Barber again emphasized the Company's international licensing agreements with Riverside to develop Six Flags-branded parks in China.  They stated:

> [REID-ANDERSON]  During the quarter, we also entered into new international licensing agreements to build one Six Flags branded park in Saudi Arabia, and 4 new parks in Nanjing, China, bringing the total to 13 parks outside of North America.

*Our international licensing program is growing exponentially and providing additional diversification to our portfolio, and the opportunity for future growth remains very compelling.*

\*       \*       \*

Fifth, building our international licensing franchise. Our strong global brand allows us to extend into emerging markets where the middle class is growing and entertainment options are limited.

We've also developed 2 new innovative park concepts, Kids World and Adventure Park in addition to our theme park and water park brands.

This allows us to develop entertainment complexes providing additional value and more quickly expanding our global footprint.

*This should super charge revenue growth.*

So our modified EBITDA less CapEx margins remain the highest in the industry by several hundred basis points, and our growing franchise revenue and recurring revenue stream from memberships should allow us to rerate to a significantly higher multiple.

We are fully committed to enhancing shareholder value every minute of every day. We will return all excess cash flow to shareholders in the form of dividends and share buybacks, and our dividend yield of more than 4.5% is among the highest in the U.S. market.

We expect to continue growing dividend each year by high single digits for the foreseeable future.

Our Project 750 goal reflects a 10% annualized EBITDA growth rate from the end of 2017.

Yes, I've said it before, it is an ambitious goal. But we believe it is achievable, given our significant and unique high-margin growth opportunities. *This makes Six Flags the ultimate growth and yield stock.*

\*       \*       \*

[ANALYST] Hi. This is Sean Wagner on for James. Wondering, was there any benefit from the Chinese park announced in late June to the international piece. And I guess is there any update on the opening timetable of the initial Chinese parks? I think it was 3 parks in late 2019 and another 4 in early 2020, if I'm right?

[BARBER] *That's right.* So we actually announced the park in China – or the parks in China, in April, I believe. But yes, in terms of the run rate, it's about $15 million in Q3. That will go up as we now have those 4 parks in China plus Saudi Arabia, we'll be in for a full quarter. And then, that'll pretty much be the run rate until they open or until we announce new parks.

[REID-ANDERSON]  I would tell you, because I think there were a couple of questions about this that have come up.  The revenue that we generated in Q2 for international is the highest in our history, and it's growing really nicely.  So again, it's the same sort of logic that as you get bigger numbers, your percentage growth may look lower.  But we're registering records and we believe we will continue to do that.  ***The timing of the parks remains exactly the same as previously disclosed, there's no change on any of those***.

*       *       *

[ANALYST]  Okay.  Thanks.  And then I guess is there a restriction, I guess, just on team size on your ability to open more international parks?  Is there – or can you kind of roll these out as fast as you want?

[REID-ANDERSON]  ***There's no restriction on our ability to add parks***.  The only restriction is our process that we go through to make sure that we've got the right sites and the right partners.  And as I've mentioned before, Ryan, no we won't add parks or announce parks until we feel comfortable that we're adding in the right places and with the right people.  But our team is ready in the event we add more and when we add more.

(Emphasis added).  Barber also added that "revenue from international licensing should accelerate further, as we continue to add new licensing arrangements and over the long-term begin opening parks."

58.     The Q2 2018 earnings call presentation was accompanied by a series of slides that were identical in substance to those included in the Q1 2018 presentation, as described above.

59.     On October 24, 2018, Six Flags held its Q3 2018 earnings call.  The call was attended by Reid-Anderson and Barber.  During the call, Reid-Anderson described the Company's anticipated Chinese parks as "an incredible lineup of new parks to come [with] a lot of revenue to come."  On the call, Reid-Anderson and Barber also had the following colloquy with a securities analyst:

[ANALYST]  And then I guess more broadly – I think it was 3 Chinese parks that were expected to open in the fourth quarter of next year as well.  Maybe give us an update on those guys' construction, how's that coming along? Anything you could give us would be great.

*       *       *

[BARBER]  Okay.  So you mentioned the Chinese parks.  We – those start to come online in Zhejiang, the theme park, water park and kids' park are early 2020.  The Chongqing parks are during 2020.  That's a theme park, a water park, a kids' park and an adventure park.  Those are mid-2020.  And then Nanjing, those will start to open up in 2021.  The water park, Kids World first, the adventure park in 2021 as well in Nanjing.  And then the Nanjing theme park will actually open up in 2022 midyear.  Then that leaves Saudi, which is scheduled to open up in 2022.

[REID-ANDERSON]  And I want to reinforce that, that's an incredible lineup of new parks to come and a lot of revenue that will come.  But concurrently, we have a small team that is working very aggressively on other partners and other licensing.  And over time, as I said before, they are basically like M&A deals.  We'll announce them as soon as we have news, but don't forget that we're working on those in the background.

[ANALYST]  Okay.  But just to clarify.  I thought the first round of Chinese parks were originally slated for late next year. Did I just get that wrong?  Or did those get pushed back?

[BARBER]  They are – technically, it's the first of 2020.  I think ultimately – earlier we were saying late 2019, which was in the fourth quarter.  So it – really the shift is a month or two.  It's not much.

Later in the call, Reid-Anderson told investors that "[t]his is [the] time to buy Six Flags shares."

60.   The Q3 2018 earnings call presentation was accompanied by a series of slides that were identical in substance to those included in the Q1 2018 presentation, as described above.

61.   The Q1, Q2, and Q3 2018 statements set forth above in ¶¶ 53-60 were materially false and/or misleading because Defendants misrepresented and failed to disclose the following adverse facts about the Company's business, operations, and prospects, which were known to or recklessly disregarded by them: (i) Riverside faced far more financial distress than disclosed to investors; (ii) as a result, there was a significant risk and a high likelihood that Riverside would default on its payment obligations to the Company; (iii) the Company's international strategy, which relied predominantly on Riverside to develop Six Flags-branded parks in China to drive revenue growth, was significantly less promising than represented to investors; and (iv) as a result of the foregoing, Six Flags' statements about its business, operations, and prospects lacked a reasonable basis when made.

62.     Immediately thereafter, during November 2018, the Company repurchased 518,212 shares of its common stock at an average price of $57.15 per share.  The following month, December 2018, the Company purchased an additional 6,657 shares at an average price of $57.97 per share.  These purchases were made at prices that were artificially inflated by the Company's false and misleading statements to the market.

63.     On February 14, 2019, the Company issued a press release surprising investors by announcing a revenue adjustment of $15 million in Q4 2018 related to the Company's agreements with Riverside due to delays in the opening dates of some of the parks in China.  It stated:

> Record fourth quarter 2018 revenue of $270 million grew $13 million or 5 percent compared to the fourth quarter of 2017.  The strong revenue growth was primarily driven by a 6 percent increase in guest spending per capita and a 3 percent increase in attendance.  This growth was offset by an unfavorable revenue adjustment of $15 million related to the company's international agreements due to delays in the expected opening dates of some of the parks in China caused by a challenging macroeconomic environment.  This resulted in a 38 percent decline in sponsorship, international agreements and accommodations revenue compared to the fourth quarter of 2017.

Six Flags also told investors that in addition to adjusting its revenue recognition to the new project timelines, it expected weaker than anticipated quarterly revenue from its agreements with Riverside in 2019 and 2020.

64.     Six Flags nevertheless downplayed the significance of these disclosures and continued to misrepresent the prospects of the development of its branded parks in China.

65.     On the Company's February 14, 2019 earnings call for Q4 2018 and FY 2018, which was attended by Reid-Anderson and Barber, Reid-Anderson claimed that:

> Our international agreements continue to be a significant contributor to revenue growth as revenue approached $42 million in 2018.  It would have been approximately $15 million higher if not for our fourth quarter adjustment to reflect delays in some of the China Parks' opening schedules caused by recent macroeconomic events that many companies are experiencing and from which our partner is not immune.  The delays result from 3 main areas: first, the economy in China is experiencing a general malaise due to global trade tensions and the lowest pace of GDP growth in almost 30 years; second, new policies and regulations have

reduced the volume of real estate transactions, our partner's primary business and made it more difficult for private companies to obtain loans; third, recent turnover of government officials in Chongqing and Nanjing has caused development plans to be temporarily paused until the plans can be reviewed and reapproved by new leadership.

As a result of these conditions, we performed a comprehensive review of our project timelines jointly with our partner.  Although we have reasons to believe conditions could improve in China during the second half of 2019, we now expect our high-end parks to begin opening in mid- to late 2020 versus 2019, our Chongqing parks to begin opening in mid to late 2021 versus 2020, and Nanjing to begin opening in late 2022.

Because we recognize revenue for each part rapidly over the development period, park opening or funding delays require us to adjust our revenue recognition to the newly expected project timelines.  For this reason, we anticipate that quarterly revenue from our international agreements may be lumpy in 2019 and possibly 2020 as our China partner works through these macroeconomic issues.  Although the timing of the ensuing revenue adjustment is unfortunate, our partner in China remains fully committed to developing and opening these parks, and construction is continuing.

*      *      *

I want to reinforce the strong positive and enduring impact that will come from our international agreements, a growth strategy that is unique to Six Flags.

In 2018, we announced 5 new international parks, all of which will contribute to our long-term growth.  We now have 5 locations across 3 countries, each with separate approvals and funding sources.  Even the 3 complexes in China should be considered independently as they have separate local government and financial sponsors.  As a result, the pace of development may differ for each location.

In addition, I also want to reinforce that we're having discussions with multiple potential partners regarding new locations outside of China.

66.     Later in the same call, Reid-Anderson and Barber had the following colloquy with

a securities analyst:

[ANALYST]  Hi.  Good morning.  Thanks for taking my question.  ***So I wanted to ask a few on the international side of things, maybe first on China. Can you talk a little bit more about your partner over there? How healthy are they right now? Maybe talk about the financing behind some of these projects.  Are there any potential issues as far as having enough funds to continue to do construction?***

[REID-ANDERSON]  Yes, I would jump in, and then, Marshall, you just fill in the blanks.  We really have a first-class partner in China with Riverside.  ***And they've so far successfully navigated the political and the regulatory environment there,***

**which you know is challenging.  But the issues that they have faced are being experienced by every other private company in China**.  But I will point out that each theme park location is independent of the other.  Each will provide great economic value to the municipality and were approved by prior government.  So where – I've talked about new government coming in.  They go through a process of assessing this.  So we very much believe and our partner very much believes the situation is going to improve.  It's likely to be probably the second half of the year.  And then at that point, we'll be in a position, I think, where we can move forward.  Marshall, do you want to add to that at all?

[BARBER]  Yes, just, I guess, to say that our partner – he has a lot assets. I think, from a real estate perspective that Jim talked about, it's the liquidity.  I think, has been tougher for other companies.  But he's in great shape.

[REID-ANDERSON]  He continues to pay.

[BARBER]  He has continued to pay us, and that's important.  **So we're excited about the fact that he's in pretty good shape, although in a tough environment. And I'm excited about the mid- and long-term potential**.

*      *      *

[ANALYST]  I just had a couple of follow-up questions for earlier questions.  Is the financing for each park in China entirely in place? Or does that need to be secured?

[REID-ANDERSON]  Well, the financing comes from many sources, including the federal government and the local governments.

[BARBER]  And the – our partner.

[REID-ANDERSON]  And our partner as well.  So what I'd say is that the – there's – that Riverside is providing the funding for the development of the parks. They have also the ability to source additional funding from other lenders and equity investors as well as the government.  So as these parks progress on from announcement going forward, the dollars will come as they are committed, and they'll come as the parks are being built.

[BARBER]  So the financing is in place, and the financing then gets expanded as time goes on and parks are added on.

(Emphasis added).

67.     In response, the Company's stock price dropped over 14%, from $63.87 per share on February 13, 2019 to $54.87 per share the next day, erasing more than $756 million in market capitalization.

68.    On March 7, 2019, Six Flags announced that Reid-Anderson would retire by the

end of February 2020.

69.    Then, on April 24, 2019, Six Flags held its Q1 2019 earnings call.  The call was

attended by Reid-Anderson and Barber.  During the call, Reid-Anderson stated that:

> We continue to work with our international partner in China, meeting government
> officials for each of our 3 park complexes, and we believe conditions in China have
> slowly begun to improve.  Like virtually every theme park project in these markets,
> we have experienced some opening delays.  But *we should not lose sight of the
> fact that these short-term delays and lumpy revenue patterns are not material in
> the context of the long-term opportunity*.
>
> *             *             *
>
> Yes.  And Tim, just with regard to where we are with those parks, I got at this a
> little bit earlier when we were talking, but I want to go over it again.  *First and
> most important, the issues that we're facing aren't specific to us, they're being
> faced by basically all companies, especially private companies in China.  I
> mentioned that Riverside very successfully navigating the political and regulatory
> environment, and we're optimistic that they'll continue to do so.  The dates that
> we had described on the last call and still hold now really reflect awaiting
> government approval*, and that's something we can't define.  I'd love to be able to
> say this is exactly going to be the date, but at least we do know there have been
> several meetings with the local governments, including with – our own people
> there, not just our partner.  And it does feel like conditions are improving, but we'll
> know as time goes on.  And obviously, as I said earlier, Tim, we'll advise you guys
> and our shareholders as we know.

(Emphasis added).

70.    Finally, responding to an analyst inquiry concerning whether the developments in

China were on track, Reid-Anderson stated as follows:

> [ANALYST]  So most of our questions have been answered, but I just wanted to
> quickly check, since like the majority of the, I guess, like key parks in China that's
> on track for approval, but is there any, I guess, like new incremental delays to any
> of the parks that we should be aware of or you foresee coming in the sort of near
> term?
>
> [REID-ANDERSON]  No, Mark.  *There are no delays that we're aware of on any
> of the parks.  The same timing as we outlined on the fourth quarter call*.  And I
> would also add that we are working hard – our team is working very hard to identify
> other potential new parks, and we have discussions ongoing with various peopleut
> obviously, the timing of those will depend on when we can reach agreements.

- 24 -

(Emphasis added).

71.     The Q1 2019 earnings call presentation was also accompanied by a series of slides that were identical in substance to those included in the Q1 2018 presentation, as described above.

72.     On May 22, 2019, Barber represented Six Flags during the B. Riley FBR Institutional Investor Conference.  During the call, Barber stated that "there's [sic] been struggles over the last 4 or 5 years that we've been working with [Riverside] that they've always managed to get through . . . [a]nd we're optimistic that he can get through this."

73.     The Q4 2018 and Q1 2019 statements set forth above in ¶¶ 63, 65-66, 69-72 were materially false and/or misleading because Defendants misrepresented and failed to disclose the following adverse facts about the Company's business, operations, and prospects, which were known to or recklessly disregarded by them: (i) Riverside faced far more financial distress than disclosed to investors; (ii) as a result, there was a significant risk and a high likelihood that Riverside would default on its payment obligations to the Company; (iii) the Company's international strategy, which relied predominantly on Riverside to develop Six Flags-branded parks in China to drive revenue growth, was significantly less promising than represented to investors; and (iv) as a result of the foregoing, Six Flags' statements about its business, operations, and prospects lacked a reasonable basis when made.

74.     In fact, Six Flags' exclusive partner in China, Riverside, had been experiencing drastically greater financial hardships than the Company let on.  These hardships were not shared by all other companies in China, as represented.  Nor were they merely short-term setbacks. Indeed, Riverside had stopped payments to its lenders and contractors, leading to multiple lawsuits against it and its subsidiaries.

75.     According to a subsequent Wedbush analyst report (*see* ¶ 83, below), these problems had been going on for some time:

Recent reports from various Chinese press outlets indicate that the Riverside Group, SIX's exclusive partner in China, is facing capital constraints. The reports suggest Riverside has fallen behind on payments to its lenders and contractors leading to multiple lawsuits against the Chinese developer and its subsidiaries.

One such contractor, Aofei Entertainment, who is in charge of developing promotional material for the Chinese Six Flags parks in Zhejiang has taken Riverside to court *seven times* already due to non-payment. Another contractor who developed one of the play areas at Zhejiang alleges they have not been paid for *over six months*. . . .

(Emphasis added).

**Six Flags Is Forced to Admit that Its Chinese Projects Are in Doubt**

76.     On October 23, 2019, Six Flags revealed that "the Chinese market remains difficult, and we are likely to continue to recognize lumpy international agreements revenue until we see progress there from a macroeconomic, real estate and trade perspective." As a result, the Company again postponed its park openings in China stating that "there's a very high likelihood going forward that we will see changes in the timing of park openings" and "it's unrealistic to think it's going to be exactly as we've outlined." The Company also revealed that it was continuing to suspend revenue recognition related to four of its Chinese parks in development.

77.     The Company's stock price responded by dropping 12.4% from $51.23 per share on October 22, 2019 to $44.88 per share on October 23, 2019, wiping out $536 million in market capitalization.

78.     By December 2019, reports began to appear in the Chinese media that Riverside's continued viability was in doubt.

79.     On December 8, 2019, Riverside posted a statement on its Chinese website acknowledging its financial difficulties during 2019.

80.     In early December, it was reported that Riverside would begin mass layoffs, going from 754 staff at headquarters to just 65, and that construction at the parks planned for Nanjing, though still in progress, was occurring at a very slow pace.

81.     According to a December 20, 2019 post on the theme park industry "thethemeparkguy" blog, which tracked the Chinese reporting:

> According to a new article, which is also paraphrased to English here, up to 90% of Riverside Group's employees are or will be laid off and according to tourism industry "experts", ***Riverside Group is "dying"***.  Riverside Group is facing legal troubles.  Among the issues, the company is being taken to court constantly, for instance, a media company hired to make promotional material for the upcoming Six Flags park in Zhejiang was not properly compensated for their services and have taken Riverside Group to court seven times.  Former employees of Riverside Group are complaining to reporters about not being fully paid while working there.  Executives at Riverside Group are being accused of spending frivolous amounts of money on extravagant ski trips and parties while meanwhile the company has a large loan due for payment next month which will go unpaid and become overdue.  The reporters for the article visited the construction site of Six Flags in Zhejiang.  They claim that ***the construction site has been abandoned*** with no work taking place [(emphasis added)]:



82.     By December 23, 2019, it was being reported in the Chinese media that trading of Riverside's stock was halted on its local Chinese exchange.

83.     On January 6, 2020, a securities analyst following Six Flags, Wedbush, published a report describing the depth of Riverside's problems.  The report stated in part:

**Six Flags' Chinese Partner Facing More Financial Pressure**

Recent reports from various Chinese press outlets indicate that the Riverside Group, SIX's exclusive partner in China, is facing capital constraints.  The reports suggest Riverside has fallen behind on payments to its lenders and contractors leading to multiple lawsuits against the Chinese developer and its subsidiaries.

One such contractor, Aofei Entertainment, who is in charge of developing promotional material for the Chinese Six Flags parks in Zhejiang has taken Riverside to court seven times already due to non-payment.  Another contractor who developed one of the play areas at Zhejiang alleges they have not been paid for over six months.  These contractors and others have successfully lobbied Chinese courts to institute an equity freeze on Riverside and its subsidiaries while their respective lawsuits await trial.

In addition, Riverside has recently undergone large scale layoffs.  A statement from the company stated that due to a depressed real estate market in the country, the company's developments have encountered "bottlenecks".  This has necessitated layoffs to hundreds of Riverside employees or up to 90% of its workforce according to Chinese media sources.  Some of these former employees have reported that they have yet to receive full payment from Riverside for prior work.

Chinese reporters recently visited the Zhejiang park construction site and claimed that the development had been abandoned with no signs of ongoing construction. We note the Zhejiang park was the first Chinese park announced by Six Flags back in 2018 (2 years earlier than Chongqing and almost 3 years before Nanjing). Theoretically Zhejiang should be the furthest developed at this point, and if the reports are to be believed this is certainly a troubling signal for the two other projects.

84.     Still, Six Flags' management failed to publicly acknowledge the depth of these issues.  A January 8, 2020 Jeffries analyst report noted the "[r]eports of financial distress at SIX's Chinese development partner," but also stated that such reports were ***"unconfirmed" by Company management***.

85.     Finally realizing that it was now only a matter of time before the true extent of Riverside's financial problems would become widely-known, on January 10, 2020 the Company belatedly admitted that the future of its China projects was in jeopardy.  The Company announced that "[t]he development of the Six Flags-branded parks in China has encountered continued challenges and has not progressed as . . . [the Company] had expected."

86.     The Company also reported that Riverside "continues to face severe challenges due to the macroeconomic environment and declining real estate market in China," which caused Riverside to default on its payment obligations to Six Flags, and that the Company had delivered formal notices of default to Riverside.  Six Flags further revealed that "the eventual outcome is

unknown and could range from the continuation of one or more projects to the termination of all the Six Flags-branded projects in China."

87.     In addition, the Company told investors that in Q4 2019 it would not realize any revenue from its agreements with Riverside and that it expected a negative $1 million revenue adjustment related to those agreements, which would offset a portion of the revenue from Six Flags' other international agreements.  The Company also announced one-time charges totaling approximately $10 million related to Riverside's default.

88.     In response to the foregoing, the Company's stock price fell 17.8% from $43.76 per share on January 9, 2020 to close at $35.96 per share the following day, eliminating another $659 million in market capitalization.

89.     On February 20, 2020, before the market opened, the Company issued a press release announcing that it had a ***net loss*** for Q4 2019 of $(11) million, down $91 million from the $79 million in net income in Q4 2018.  It stated this was due in part to "charges of approximately $10 million related to the company's China development agreements and certain unrelated litigation matters."  Six Flags also announced that it had formally terminated its agreements with Riverside:

> During 2019, the company's partner in China defaulted on its payment obligations to the company.  As a result, in February 2020 the company terminated the development agreements.  It is unlikely that the company will recognize any revenue or income in 2020 related to the development of parks in China.

90.     The Company further disclosed that its new 2020 financial guidance of Adjusted EBITDA between $435 million and $465 million assumed "significantly lower revenue contribution from the company's international development agreements."

91.     Finally, in this same press release, the Company disclosed that Defendant Barber would step down from his position as CFO effective February 25, 2020.  Nevertheless, the

Company agreed to pay him $10,913.46 per week through August 31, 2020 and allow him to continue to participate in or receive benefits under the employee benefit programs of the Company.

92.     Six Flags' announcements once again sent its stock price plummeting from $38.02 per share on February 19, 2020 to $31.89 per share the next day.  This 16% drop wiped out another $518 million in market capitalization.

## DAMAGES/HARM TO SIX FLAGS

93.     As a direct and proximate result of Defendants' misconduct, Six Flags has suffered and continues to suffer significant harm, including but not limited to:

(a)     The loss of credibility associated with Six Flags' dissemination of improper public statements concerning its international projects in China, and the Company's associated loss of nearly $2.5 billion dollars in market capitalization as the misconduct came to light;

(b)     Legal and other costs incurred, and the distraction of, investigating and defending Six Flags and the Officer Defendants in the Securities Class Actions, as well as potentially millions of dollars in damages in connection with any settlement of or judgment in the Securities Class Actions or any related litigation;

(c)     Excess costs associated with the artificial inflation present in the 524,869 shares of Six Flags common stock repurchased by the Company for approximately $30 million in Q4 2018;

(d)     Harm to Six Flags' corporate image and goodwill.  For the foreseeable future, the Company will suffer from what is known as the "liar's discount," a term applied to the stock of companies which have been implicated in misleading the investing public, such that Six Flags' ability to raise equity capital or debt on favorable terms in the future

is now and will continue to be impaired. The Company stands to incur higher marginal costs of capital and debt because of the misconduct;

(e)     Profits realized by Reid-Anderson from selling his personal holdings of Six Flags common stock between June 7 and June 20, 2018 based upon material adverse, nonpublic information, which constitutes an asset belonging to the Company; and

(f)     Costs incurred from compensation and benefits paid to Defendants and other members of Six Flags' management while they were engaged in the improper conduct alleged herein, which compensation was based at least in part on the Company's artificially inflated stock price.

## DEFENDANTS' DUTIES

### Defendants' Fiduciary Duties

94.     By reason of their positions as officers and/or directors of Six Flags and because of their responsibility to control the business and corporate affairs of the Company, Defendants owed, and owe, the Company and its stockholders the fiduciary obligations of good faith, loyalty, due care, and candor and were, and are, required to use their utmost ability to control and manage the Company in a just, honest, fair, and equitable manner. Each Defendant owed, and owes, the Company and its stockholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company, as well as the highest obligations of fair dealing and not to act in furtherance of his or her personal interest or benefit.

95.     Because of their positions of control and authority as officers and/or directors of Six Flags, Defendants were able to, and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein. Because of their advisory, executive, managerial, and directorial positions with Six Flags, each Defendant had knowledge of material, nonpublic information regarding the Company. In addition, as officers and/or directors of a publicly-held

company, Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's business, operations, and prospects so that the market price of the Company's stock would be based on truthful and accurate information.

96.     At all times relevant hereto, each Defendant was the agent of each of the other Defendants and of Six Flags and was at all times acting within the course and scope of such agency.

97.     To discharge their duties, Defendants were, and are, required to exercise reasonable and prudent oversight and supervision over the management, policies, practices, and controls of Six Flags.  By virtue of such duties, Defendants were, and are, required to, among other things:

(a)     exercise good faith to ensure that the Company is operated in a diligent, efficient, honest, and prudent manner and in accordance with all applicable laws (including federal and state laws, government rules and regulations, and the Company's Certificate of Incorporation and Bylaws);

(b)     neither violate nor knowingly permit any officer, director, or employee of Six Flags to violate any applicable laws, rules, or regulations;

(c)     remain informed as to the status of Six Flags' operations, and upon receipt or notice of information of imprudent or unsound practices, to make a reasonable inquiry in connection thereto and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and affairs of Six Flags and procedures for the reporting of the Company's business and affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate, functioning system of internal controls, such that the affairs and operations of Six Flags are conducted in accordance with all applicable laws, rules, and regulations; and

(f)     truthfully and accurately inform and guide investors and analysts with respect to the business operations of the Company.

**Duties Pursuant to the Company's Corporate Governance Guidelines**

98.     The Company's Corporate Governance Guidelines ("Governance Guidelines") were adopted by the Board to, along with the Certificate of Incorporation, Bylaws, and Board Committee Charters, form the framework for governance of the Company.  These guidelines apply to the Director Defendants in connection with their membership on Six Flags' Board.

99.     According to the Governance Guidelines, the Board's role is "to oversee management and to assure that the long-term interests of the stockholders are being served."  The Board's functions include "reviewing, approving and monitoring fundamental financial and business strategies and major corporate actions," "assessing major risks facing the Company and reviewing options for their mitigation," and "ensuring processes are in place for maintaining the integrity of the Company including the integrity of the financial statements, the integrity of compliance with law and ethics, the integrity of relationships with guests and suppliers, and the integrity of relationships with other stakeholders."

**Duties Pursuant to the Company's Code of Conduct**

100.     Defendants were also bound by the Company's Code of Business Conduct and Ethics ("Code of Conduct"), which applies to all Six Flags directors, officers, and employees.

101.     Among other things, the Code states that the Company is "committed to the principle of conducting business in a responsible, honest and ethical manner."

102.     With respect to legal compliance, it states that "You, Six Flags' other employees and directors are required to comply with all applicable laws where we do business.  Any instance of non-compliance with applicable law(s) may subject the employee to corrective action up to and including termination of employment, recovery of damages, and filing of criminal charges."

103.    With respect to Insider Trading, it states:

As a Six Flags employee or director, you (including members of your immediate family and household) are not allowed to trade or to tip others to trade our securities or securities of other companies with which we conduct or intend to conduct business when you are aware of material information that has not been made available to the public.  Material information is any information that could be considered important by a person in deciding whether to trade in a company's stock.  Examples include: information relating to attendance, sales, inventory, margins, earnings, significant proposed acquisitions, planned stock splits or other recapitalization and other information that has the potential to affect the stock price of Six Flags or another company.  As a general rule, if the information makes you think of buying or selling the stock of Six Flags or another company, it probably would have the same effect on others and probably is material information.  This insider trading policy applies to all directors, officers, employees, consultants and contractors of the Company and its subsidiaries, as well as members of their immediate families and members of their households.

Trading on inside information can have severe consequences.  The United States Securities and Exchange Commission and similar agencies are authorized to bring a civil lawsuit against anyone who trades on inside information (or who provides another person with inside information) and also against the Company.  Insider trading is also a crime subject to criminal penalties, including jail terms.

104.    With respect to the accuracy of Company records and integrity in reports and communications, it states:

Data, information and records that are owned, collected, used and maintained by Six Flags must be accurate and complete.  You are responsible for ensuring the accuracy and integrity of all Company data, information and records under your control.

*       *       *

As a public company, Six Flags is required to file periodic reports and make certain public communications.  Employees must act to ensure full, fair, accurate, timely, and understandable disclosure and reporting of Company information, including the Company's financial results and financial condition.

All employees must comply with Company policies, procedures and controls.  Accounting and financial reporting must accurately reflect actual transactions and must follow the Company's accounting and internal control policies as well as all applicable generally accepted accounting principles and laws.

**Additional Duties of the Audit Committee Defendants**

105.    In addition to the duties discussed above, the Audit Committee Defendants owed

specific duties to Six Flags under the Charter of the Audit Committee of the Board of Directors of

Six Flags Entertainment Corporation ("Audit Charter").  According to the Audit Charter, the Audit

Committee's "Purpose" is as follows:

> The Audit Committee's primary function is to assist the Board of Directors (the
> "Board") of Six Flags Entertainment Corporation (the "Company") with its
> responsibility of overseeing the integrity of the Company's financial statements,
> the Company's compliance with legal and regulatory requirements, the
> qualifications and independence of the Company's independent accountants and
> the performance of the Company's internal audit staff and independent accountants.
> The Committee shall oversee and review the preparation of the Audit Committee
> Report for the Company's annual proxy statement.  The Committee shall also
> monitor the Company's safety programs.

106.    Among other things, the Audit Charter provides the Audit Committee Defendants

with the following authority and responsibilities for the oversight of financial reporting and

controls:

> **<u>Oversight of Financial Reporting and Controls</u>**.  The Committee shall:
>
> (a)    review and discuss with management and the independent accountants the
>        annual audited financial statements and quarterly financial statements to be
>        included in the Company's reports filed with the Securities and Exchange
>        Commission ("SEC"), including Management's Discussion and Analysis of
>        Financial Condition and Results of Operations;
>
> (b)    review and discuss the following with management and the independent
>        accountants, in connection with the Committee's review of the Company's
>        annual financial statements and, as appropriate, quarterly financial
>        statements and related disclosures:
>
>        *        *        *
>
>        (ix)    major financial risk exposures and the steps management has taken
>                to monitor and control such exposures, including the Company's
>                risk assessment and risk management policies
>
> (c)    review the type and presentation of information to be included in earnings
>        press releases (particularly any "pro forma" or "adjusted" non-GAAP
>        information), as well as financial information and earnings guidance which
>        management may provide to analysts and rating agencies; provided,

however, that such review need not take place in advance of each earnings release or each instance in which guidance may be provided;

*       *       *

(d)     inquire of the Company's Chief Executive Officer, Chief Financial Officer and Chief Accounting Officer as to the existence of any significant deficiencies in the design or operation of internal controls that could adversely affect the Company's ability to record, process, summarize and report financial data, any material weakness in internal controls, and any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal controls.

### CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

107.    In committing the wrongful acts alleged herein, Defendants have pursued, or joined in the pursuit of, a common course of conduct and have acted in concert with and conspired with one another in furtherance of their common plan or design.  In addition to the wrongful conduct alleged herein giving rise to primary liability, Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

108.    During all times relevant hereto, Defendants, collectively and individually, initiated a course of conduct that was designed to and did, among other things: (a) deceive the investing public including stockholders of Six Flags; (b) cause the Company to waste corporate assets by repurchasing its own stock at prices artificially inflated by Defendants' misconduct; (c) allow trading of management's personally held Six Flags' shares based upon material nonpublic information; and (d) permit flawed and ineffectual internal controls over the Company's operations.  In furtherance of this plan, conspiracy, and course of conduct, Defendants, collectively and individually, took the actions set forth herein.

109.    Defendants engaged in a conspiracy, common enterprise, and/or common course of conduct.  During this time, Defendants caused and/or allowed the improper conduct described herein.

110.    The purpose and effect of Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise Defendants' violations of state and federal law, breaches of fiduciary duty, waste of corporate assets, unjust enrichment, and to conceal adverse information concerning the Company's operations and future prospects.

111.    Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully or recklessly engage in improper conduct described herein.  Because the Defendants' actions occurred under the authority of the Board, each Defendant was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

112.    Each Defendant aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Defendant acted with knowledge of the primary wrongdoing, substantially assisted in the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## DERIVATIVE ALLEGATIONS

113.    Plaintiffs bring this action derivatively in their own right and for the benefit of the Company to redress injuries suffered, and to be suffered, by Six Flags as a direct result of the breaches of fiduciary duty, waste of corporate assets, unjust enrichment, and violations of the federal securities laws by Defendants.

114.    Six Flags is named as the Nominal Defendant in this case solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

115.    Plaintiffs will adequately and fairly represent the interests of the Company and its stockholders in prosecuting this action.

116.    Due to the Board's direct involvement in the wrongdoing, its members' lack of independence, and the substantial likelihood of liability its members face, prosecution of this action independent of the current Board is in the best interests of the Company and its stockholders.

## FUTILITY ALLEGATIONS

117.    Plaintiffs incorporate by reference all prior paragraphs as if fully set forth herein.

118.    Six Flags' current Board consists of nine members, including four non-party directors.  Plaintiffs have not made any demand on the present Board to institute this action because such a demand would be a futile and useless act.

**Demand Is Excused as to Non-Party Spanos Because He Lacks Independence**

119.    Non-Party Spanos falls under the NYSE's "bright-line" independence disqualification.  According to the NYSE's Listing Standards, a director is not independent if he or she is, or has been within the last three years, an employee or an executive officer of the listed company.  Because Spanos is Six Flags' current President and CEO, he may not be considered independent.

120.    Furthermore, Spanos is not independent because his principal professional occupation is his employment with Six Flags.  As President and CEO beginning on November 18, 2019, Spanos' compensation includes a starting base salary of $1,150,000 per year and an annual bonus with a target of 150% of his base salary.  For 2019, he received a signing bonus of $215,000.  Upon hiring, Spanos was granted options to purchase 305,000 shares of the Company's common stock and associated dividend equivalent rights in accordance with a nonqualified stock option agreement under the Company's Long-Term Incentive Plan, and a performance-vesting stock unit and associated dividend equivalent rights with respect to 10,000 shares under the Company's Long-Term Incentive Plan.  He was also granted restricted stock units of the Company with a value of $2,000,000, and additional sign-on options to purchase

120,000 shares of the Company's common stock and associated dividend equivalent rights in accordance with a nonqualified stock option agreement under the Company's Long-Term Incentive Plan. Spanos is also entitled to participate in or receive benefits under the employee benefit programs of the Company, including the Company's life, health, and disability programs, as well as to receive reimbursement of certain expenses incurred during his employment. Finally, upon being hired, Spanos received a relocation allowance of $165,000.

121. Accordingly, Spanos lacks independence from the other members of the current Board due to his interest in maintaining his executive position. This lack of independence renders Spanos incapable of impartially considering a demand to commence and vigorously prosecute this action.

**Demand Is Excused Because Roedel, Cellar, Krejsa,**
**Luther, and Owens Face a Substantial Likelihood**
**of Liability for Their Misconduct**

122. Five of the nine members of the current Board, Defendants Roedel, Cellar, Krejsa, Luther, and Owens, breached their fiduciary duties of loyalty and good faith by failing in their oversight responsibilities by, among other things: (a) allowing the false and misleading statements provided to the investing public; (b) permitting the Company to waste corporate assets by repurchasing its own stock at prices artificially inflated by Defendants' misconduct; (c) failing to implement, maintain, and monitor appropriate internal controls over the Company's public release of information to analysts and investors; and/or (d) failing to implement, maintain, and monitor appropriate internal controls over transactions in Company stock by Six Flags' insiders and the Company itself.

123. Accordingly, Roedel, Cellar, Krejsa, Luther, and Owens face a substantial likelihood of liability for their breach of fiduciary duties, making any demand upon them futile.

124.    Defendants Roedel, Cellar, and Owens, as members of the Audit Committee at relevant times, had a duty to properly oversee Six Flags' corporate accounting and financial reporting processes, systems of internal control over reporting and audits of financial statements, systems of disclosure controls and procedures, as well as the quality and integrity of the Company's financial statements and reports.   Thus, the Audit Committee Defendants were responsible for knowingly or recklessly allowing and failing to correct the improper conduct and public statements detailed herein.   The Audit Committee Defendants breached their fiduciary duty of loyalty and good faith by approving or otherwise allowing the improper statements, and therefore failing to properly oversee Six Flags' compliance with financial reporting requirements and the Company's disclosure controls.   For these reasons, Defendants Roedel, Cellar, and Owens face a substantial likelihood of liability for their breach of fiduciary duties, making any demand upon them futile.

**Demand Is Excused as to Defendants Roedel, Krejsa, Luther, and Ruchim Due to Their Overlapping Business Affiliations**

125.    Roedel, Krejsa, Luther, and Ruchim are incapable of impartially considering a demand to commence and vigorously prosecute this action due to their long-standing, overlapping business relationships with each other and Defendants Reid-Anderson and Nabi.

126.    To wit, Reid-Anderson joined Dade Behring Holdings Inc. ("Dade Behring") in 1996 as Executive Vice-President and CFO and later became Chief Administrative Officer and CFO in September 1997.   In April 1999, he was promoted to the role of President and Chief Operating Officer and then CEO in September 2000.   He was elected as the Chairman of the Board of Directors in October 2002, where he served until November 2007 when Dade Behring was acquired by Siemens AG.

127.    Similarly, from 1994 to 2007, Krejsa held senior roles at Dade Behring as Senior Vice President of Communications and Investor Relations, Vice President of U.S. Operations,

Treasurer, and Assistant Controller.  And, not coincidentally, Roedel was a director and Chairman of the Audit Committee of Dade Behring from October 2002 until November 2007.

128.    After the Siemens acquisition in November 2007, Reid-Anderson became the CEO of Siemens Healthcare Diagnostics and in May 2008 became a member of Siemens AG's managing board and CEO of Siemens Healthcare Sector.  At the same time, Krejsa served as Senior Vice President, Strategy and Communications for Siemens Healthcare Diagnostics from November 2007 to September 2010.

129.    After Reid-Anderson was hired as Six Flags' CEO, President, and Chairman in August 2010, Krejsa was hired two months later as Senior Vice President, Investor Relations and Corporate Communications.

130.    The Six Flags' press release announcing Reid-Anderson's hiring contained the following quote from the then-Chairman of the Board, Nabi, who had led the search committee efforts:

> "Jim is an exceptional CEO, and he brings to Six Flags an outstanding track record of shareholder value creation" said Usman Nabi, Executive Chairman of the Board of Six Flags and Senior Partner at H Partners.  "As past investors in Dade Behring, we understand the value Jim delivers to shareholders, and the Board is confident that he will repeat this success at Six Flags."

131.    Indeed, Nabi was a senior partner at H Partners Management, LLC ("H Partners"), an investment firm that formerly had a stake in Dade Behring, from February 2006 through March 2018.  Ruchim is also a partner in H Partners and has been with the investment firm since 2008.  Moreover, H Partners is and has been a significant investor in Six Flags, owning 7 million shares of SIX (8.27% of the Company) worth in excess of $195 million, as of February 26, 2020.  Its investment in Six Flags represents about 36% of its portfolio investments. The other 64% of its portfolio is invested in Tempur Sealy International, Inc. (NYSE: TPX)

("Tempur Sealy").   It owns 3.7 million shares (6.8% of the company) worth in excess of $350 million, as of February 18, 2020.

132.    Luther has served on Tempur Sealy's board of directors since May 2015, and beneficially owned 20,304 TPX shares as of March 12, 2019.  Ruchim has also been a board member of Tempur Sealy since May 2018.  Roedel served on the board of Sealy Corporation between August 2006 and March 2013, when Sealy was acquired by Tempur-Pedic International Inc.

133.    Given the foregoing mutually beneficial business relationships that have been ongoing for decades, and their expressed affinity for one another, Board members Roedel, Krejsa, Luther, and Ruchim are incapable of impartially considering a demand to sue each other or to sue Reid-Anderson or Nabi.  Further, there is reasonable doubt that they could impartially consider a demand to sue the remaining defendants because the misconduct undertaken by these individuals is substantially similar to that of Roedel, Krejsa, Luther, Ruchim, Reid-Anderson, and Nabi.  Accordingly, any suit against those individuals would necessarily implicate and expose to liability, Roedel, Krejsa, Luther, Ruchim, Reid-Anderson, and Nabi.

134.    Consequently, there is reasonable doubt that Roedel, Krejsa, Luther, and Ruchim would vote to initiate litigation against each other or the other Defendants (or otherwise vote or act in a manner inconsistent with the interests of each other) due to these long-standing and ongoing business relationships.  Demand is therefore futile as to Roedel, Krejsa, Luther, and Ruchim.

**Demand Is Excused for Additional Reasons**

135.    Any suit by the current Board to remedy these wrongs would also expose Nominal Defendant Six Flags to liability for violations of the federal securities laws in the pending Securities Class Actions and would likely result in civil actions being filed against one or more of

the Director Defendants.  If the Board elects for the Company to press forward with its rights of action in this case, then Six Flags' efforts would compromise its own defense of the Securities Class Actions.

136.  Defendants Roedel, Cellar, Krejsa, Luther, and Owens are likewise conflicted and unable to pursue the Company's claims against the Officer Defendants.  Any effort to directly prosecute such claims against the Officer Defendants for their direct roles in the violations of applicable law carried out in Six Flags' name would necessarily expose the Board's own culpability for the very same conduct.  In other words, given that the Board was required to be regularly informed concerning the Company's public reporting, outlook, and controls, any effort by the Board to hold the Officer Defendants liable would lead the Officer Defendants to defend on the ground that their own conduct was consistent with corporate policy and practice, as established by and known to the Board.

137.  Moreover, the acts complained of constitute violations of the fiduciary duties owed by Six Flags' officers and directors, and these acts are incapable of ratification.  Despite having knowledge of the claims and causes of action raised by Plaintiffs, the Board has failed and refused to seek to recover on behalf of the Company for any of the wrongdoing alleged by Plaintiffs herein.

138.  Defendants Owens, Luther, and Ruchim serve together on the Compensation Committee.  These three individuals set at least portions of their own compensation, as well as the compensation of their colleagues, Defendants Roedel, Cellar, and Krejsa.  Their capacity to dole out compensation for themselves and their colleagues makes it impossible for each of them, and any of them, to independently and disinterestedly consider a stockholder demand to investigate or prosecute an action pertaining to Defendants' illegal conduct.

139.  Plaintiffs have not made any demand on Six Flags shareholders to institute this action since such demand would be a futile and useless act for the several reasons.  First, Six Flags

is a publicly traded company with over 84.6 million shares outstanding held by thousands of individuals and entities spread throughout the country. Second, making demand on such a number of shareholders spread throughout the country would be impossible for plaintiffs who have no way of finding out the names, addresses, or phone numbers of shareholders. Third, making demand on all shareholders would force plaintiffs to incur significant expenses, assuming all shareholders could be individually identified.

## CLAIMS FOR RELIEF

### COUNT I

### Breach of Fiduciary Duties
### (Against the Officer Defendants)

140.     Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

141.     The Officer Defendants owed fiduciary duties to Six Flags and its stockholders. By reason of their positions as fiduciaries to the Company, the Officer Defendants owed duties of good faith, loyalty, candor, and truthful disclosure. The Officer Defendants also owed Six Flags fiduciary duties imposed and defined by the federal securities laws, rules, regulations, and federal substantive corporate law, which impose broad obligations on Defendants vis-a-vis the corporation and its individual stockholders. The Officer Defendants violated these fiduciary duties by issuing, causing to be issued, or otherwise allowing the material omissions and misrepresentations described herein. The Officer Defendants were well aware of the relevant disclosure laws, rules, and regulations.

142.     The Officer Defendants consciously breached their fiduciary duties and violated their corporate responsibilities in at least the following ways:

(a)      Affirmatively and repeatedly making and/or failing to correct improper statements in press releases, SEC filings, conference calls, and other public statements,

relating to, among other things, Six Flag's international strategy, its relationship with Riverside, and Riverside's financial well-being and the associated risks, as well as, the Company's business, operations, and prospects;

(b)    Failing to ensure the Company's compliance with relevant legal and regulatory requirements, including but not limited to requirements imposed under state and federal securities laws;

(c)    Selling personal holdings of Six Flags common stock based upon material, adverse, nonpublic information, which constitutes an asset belonging to the Company;

(d)    Causing the Company to repurchase artificially inflated SIX shares during Q4 2018; and/or

(e)    Failing to implement and maintain adequate internal controls.

143.    As a direct and proximate result of the Officer Defendants' breaches of their fiduciary obligations, Six Flags has sustained significant damages.  Accordingly, the Officer Defendants are liable to the Company.

144.    Plaintiffs, on behalf of Six Flags, have no adequate remedy at law.

## COUNT II

### Breach of Fiduciary Duties
### (Against the Director Defendants)

145.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

146.    The Director Defendants owed and owe Six Flags fiduciary obligations.  By reason of their fiduciary relationships, the Director Defendants specifically owed and owe Six Flags the highest obligation of good faith, fair dealing, loyalty, and due care in the administration of the affairs of the Company, including, without limitation, the oversight of the Company's compliance

with state and federal securities laws, rules, and regulations, as well as the duty of candor and truthful disclosure with respect to their public statements.

147.    The Director Defendants also owed and owe Six Flags fiduciary duties imposed and defined by the federal securities laws, rules, regulations, and federal substantive corporate law, which impose broad obligations on Defendants vis-a-vis the corporation and its individual stockholders.  The Director Defendants violated these fiduciary duties by issuing, causing to be issued, or otherwise allowing the material omissions and misrepresentations described herein.

148.    In addition, the Director Defendants have specific fiduciary duties as defined by the Company's corporate governance documents, including its Code of Conduct and the charters of various Board committees, and principles that, had they been discharged in accordance with the Director Defendants' obligations, would have prevented the misconduct and the consequent harm to the Company.

149.    Each Director Defendant violated his or her fiduciary duties by consciously causing, or consciously failing to prevent the Company from engaging in, the improper acts complained of herein.

150.    The Director Defendants consciously breached their fiduciary duties and violated their corporate responsibilities in at least the following ways:

(a)     Failing to maintain an adequate system of oversight, accounting controls and procedures, disclosure controls, and other internal controls, which were necessary to prevent or promptly correct the improper statements made on the Company's behalf;

(b)     Affirmatively and repeatedly making or allowing to be made, and/or failing to correct, improper statements in Company press releases, SEC filings, and other public statements relating to, among other things, Six Flags' international strategy, its relationship

with Riverside, and Riverside's financial well-being and the associated risks, as well as the Company's business, operations, and prospects;

(c)     Failing to ensure the Company's compliance with relevant legal and regulatory requirements, including but not limited to requirements imposed under state and federal securities laws;

(d)     Authorizing or allowing the Company to repurchase artificially inflated SIX shares during Q4 2018;

(e)     Awarding Six Flags' senior executives lavish compensation packages despite their responsibility for the Company's willful misconduct;

(f)     Facilitating or otherwise failing to prevent Reid-Anderson's improper sale of his personally held SIX shares while in possession of material, adverse, nonpublic information; and

(g)     Reappointing the same directors who had failed in their duties to the Audit Committee between 2018 and 2020.

151.    As a direct and proximate result of the Director Defendants' breaches of their fiduciary obligations, Six Flags has sustained significant damages.  Accordingly, the Director Defendants are liable to the Company.

152.    Plaintiffs, on behalf of Six Flags, have no adequate remedy at law.

## COUNT III

### Insider Selling
### (Against Defendant Reid-Anderson)

153.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

154.    In June 2018, when Reid-Anderson sold his personal holdings of Six Flags stock, he knew the information described herein and sold such stock on the basis of such information.

155.    The information described herein was material, adverse, nonpublic information concerning the Company's business and its prospects.  It was an asset belonging to the Company, which Reid-Anderson used for his own benefit when he sold Six Flags stock.

156.    At the time of Reid-Anderson's stock sales, he knew the truth about the Company's business prospects, including information specifically related to, among other things, its China expansion.

157.    Reid-Anderson's stock sales while in possession and control of this material, adverse, nonpublic information was a breach of his fiduciary duty of loyalty and good faith.

158.    Because the use of the Company's nonpublic information for his own gain constitutes a breach of fiduciary duty, the Company is entitled to the imposition of a constructive trust on any and all profits that Reid-Anderson retained thereby.

159.    As a direct and proximate result of Reid-Anderson's improper stock sales, Six Flags has been damaged.  Accordingly, Reid-Anderson is liable to the Company.

160.    Plaintiffs, on behalf of Six Flags, have no adequate remedy at law.

## COUNT IV

### Waste of Corporate Assets
### (Against All Defendants)

161.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

162.    Defendants have caused Six Flags to repurchase $30 million in Six Flags shares at prices that were artificially inflated by the false and misleading statements described herein.  The purchases at inflated prices were a waste of Company assets.

163.    Additionally, as a result of Defendants' misstatements and failure to implement adequate internal controls to ensure that the Company's SEC filings and other public statements were not misleading, Six Flags is subject to the Securities Class Actions.  Defendants have caused

Six Flags to waste its corporate assets by forcing the Company to expend valuable resources in defending itself in the ongoing litigation, in addition to any ensuing costs from a potential settlement or adverse judgment.

164.     As a result of their waste of corporate assets, Defendants are liable to the Company.

165.     Plaintiffs, on behalf of Six Flags, have no adequate remedy at law.

**COUNT V**

**Unjust Enrichment**
**(Against All Defendants)**

166.     Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

167.     By their wrongful acts and omissions, Defendants were unjustly enriched at the expense of and to the detriment of Six Flags.  Defendants were unjustly enriched as a result of the compensation and remuneration they received while breaching fiduciary duties owed to the Company.

168.     Reid-Anderson sold Six Flags stock while in possession of material, adverse, nonpublic information that artificially inflated the price of such stock.  As a result, Reid-Anderson profited from his misconduct and was unjustly enriched through his exploitation of material and adverse inside information.

169.     Plaintiffs, as stockholders and representatives of Six Flags, seek restitution from Defendants, and each of them, and seek an order of this Court disgorging all profits, benefits, and other compensation obtained by Defendants, and each of them, from their wrongful conduct and fiduciary breaches.

170.     Plaintiffs, on behalf of Six Flags, have no adequate remedy at law.

## COUNT VI

### For Contribution for Violations of § 10(b) and § 21D of the Exchange Act
### (Against the Officer Defendants)

171.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

172.    The Officer Defendants are named defendants in the Securities Class Actions.

173.    Six Flags is also named as a defendant in the Securities Class Actions, which assert claims under the federal securities laws for, *inter alia*, violations of § 10(b) of the Exchange Act. If the Company is found liable for violating the federal securities laws, the Company's liability will arise, in whole or in part, from the intentional, knowing, or reckless acts or omissions of Reid-Anderson and/or Barber, as alleged herein.  The Company is entitled to receive contribution from those defendants in connection with the Securities Class Actions against the Company.

174.    Defendants Reid-Anderson and Barber, as directors and/or officers of the Company and otherwise, had the power and/or ability to, and did, directly or indirectly, control or influence the Company's affairs, including the content of public statements about Six Flags, and had the power and/or ability, directly or indirectly, to control or influence the specific corporate statements and conduct that violated § 10(b) of the Exchange Act and Rule 10b-5.  Further, Defendants Reid-Anderson and Barber are liable under § 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of any private right of action for contribution asserted pursuant to the Exchange Act.

175.    As a result, the Officer Defendants damaged Six Flags and are liable to the Company for contribution.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment as follows:

A.      Finding that a stockholder demand on the Six Flags Board would have been a futile and useless act;

B.      Finding that Defendants have breached their fiduciary duties to the Company, wasted corporate assets, were unjustly enriched, and violated the federal securities laws;

C.      Directing Six Flags to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect the Company and its stockholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for stockholder vote resolutions for amendments to the Company's Bylaws or Articles of Incorporation, and taking such other action as may be necessary to place before stockholders for a vote the following corporate governance proposals or policies:

- a proposal to strengthen the Company's disclosure controls to ensure that all material information is adequately and timely disclosed to the SEC and the public;

- a proposal to develop and implement procedures for greater stockholder input into the policies and guidelines of the Board; and

- a provision to permit the stockholders of Six Flags to nominate three candidates for election to the Board.

D.      Against each Defendant in favor of Six Flags for the amount of damages sustained by Six Flags, jointly and severally, in an amount to be determined at trial, together with pre- and post-judgment interest at the maximum legal rate allowable by law;

E.      Requiring Defendants to return to Six Flags all compensation and remuneration of whatever kind paid to them by the Company during the time that they were in breach of their fiduciary duties;

F.      Requiring Reid-Anderson to disgorge all profits realized through his sales of Six Flags stock at artificially inflated prices while in possession of material, adverse, nonpublic information and requiring that such profits be held in constructive trust for the Company's benefit;

G.      Directing Defendants to establish, maintain, and fully fund effective corporate governance and compliance programs to ensure that Six Flags' directors, officers, and employees do not engage in wrongful or illegal practices;

H.      Granting additional appropriate equitable and/or injunctive relief to remedy Defendants' misconduct, as permitted by law;

I.      Awarding Plaintiffs the costs and disbursements of this action, including reasonable attorneys' and experts' fees and expenses; and

J.      Granting such other and further relief as this Court deems just and equitable.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury as to all issues so triable.

DATED:  August 10, 2020              **KENDALL LAW GROUP, PLLC**

                                     */s/ Joe Kendall*
                                     JOE KENDALL (Texas Bar No. 11260700)

                                     3811 Turtle Creek Blvd., Suite 1450
                                     Dallas, TX  75219
                                     Telephone:  214/744-3000
                                     214/744-3015 (fax)
                                     jkendall@kendalllawgroup.com

                                     *Local Counsel for Plaintiffs*

                                     **JOHNSON FISTEL, LLP**
                                     MICHAEL I. FISTEL, JR.
                                     40 Powder Springs Street
                                     Marietta, GA 30064
                                     Telephone: 470/632-6000
                                     770/300-3101 (fax)
                                     MichaelF@johnsonfistel.com

                                     *Lead Counsel for Plaintiffs*

- 52 -

**JOHNSON FISTEL, LLP**
FRANK J. JOHNSON
655 West Broadway, Suite 1400
San Diego, CA 92101
Telephone: 619/230-0063
619/255-1856 (fax)
FrankJ@johnstonfistel.com

**ROBBINS GELLER RUDMAN**
  **& DOWD LLP**
ERIK W. LUEDEKE
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)
eluedeke@rgrdlaw.com

**GAINEY McKENNA & EGLESTON**
THOMAS J. McKENNA
GREGORY M. EGLESTON
501 Fifth Avenue, 19th Floor
New York, NY 10017
Telephone: 212/983-1300
212/983-0383 (fax)
tjmckenna@gme-law.com
gegleston@gme-aw.com

**VANOVERBEKE, MICHAUD &**
  **TIMMONY, P.C.**
THOMAS C. MICHAUD
79 Alfred Street
Detroit, MI 48201
Telephone: 313/578-1200
313/578-1201 (fax)
tmichaud@vmtlaw.com

*Additional Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document was served on all counsel of record

on August 10, 2020 via CM/ECF, in accordance with the Federal Rules of Civil Procedure.

                          */s/ Joe Kendall*
                          JOE KENDALL

DocuSign Envelope ID: B886C789-7841-4EC0-8DEB-1B81B799C7AC

## **VERIFICATION**

I, MARK SCHWARTZ, hereby verify that I am familiar with the allegations in the Verified Consolidated Stockholder Derivative Complaint for Breach of Fiduciary Duty, Waste of Corporate Assets, Unjust Enrichment, and Violations of Federal Securities Laws ("Complaint"), and that I have authorized the filing of the Complaint and that the foregoing is true and correct to the best of my knowledge, information and belief.

Executed this 5th of August, 2020

_____

MARK SCHWARTZ

## VERIFICATION

I, _Deborah L. Martin_, acting on behalf of and with the consent of the Trustees of St. Clair County Employees' Retirement System, hereby verify that I am familiar with the allegations in the Verified Consolidated Stockholder Derivative Complaint for Breach of Fiduciary Duty, Waste of Corporate Assets, Unjust Enrichment, and Violations of Federal Securities Laws ("Complaint"), and that I have authorized the filing of the Complaint and that the foregoing is true and correct to the best of my knowledge, information and belief.

Executed this _7th_ day of August, 2020.

ST. CLAIR COUNTY EMPLOYEES'
RETIREMENT SYSTEM

By: _Deborah L. Martin_

Deborah Martin, Chairperson

1 of 2

## VERIFICATION

I, MEHMET ALI ALBAYRAK, hereby verify that I am familiar with the allegations in the Verified Consolidated Stockholder Derivative Complaint for Breach of Fiduciary Duty, Waste of Corporate Assets, Unjust Enrichment, and Violations of Federal Securities Laws ("Complaint"), and that I have authorized the filing of the Complaint and that the foregoing is true and correct to the best of my knowledge, information and belief.

Executed this _6th_ of August, 2020

_M. Albayrak_

MEHMET ALI ALBAYRAK